**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**(Harrisonburg Division)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| 1524 CC RD LLC, *et. al.,* | ) | |
| | ) | Case No. 25-50402 |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING JUNIOR SECURED POST-PETITION FINANCING PURSUANT TO
11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), respectfully state as follows in support of this motion (the "Motion"):

**PRELIMINARY STATEMENT**

1.      The Debtors filed these cases with the intention of filing a plan of reorganization that maximizes value for their estates and stakeholders.  To that end, the Debtors are pursuing exit financing to fund a plan that is intended to pay 100% of all allowed claims and permit the Debtors' equity holders to retain their interests in the Debtors.  However, like most companies entering bankruptcy, the Debtors lack sufficient immediate cash on hand to fund their operating needs and the reorganization expenses needed to effectuate their intended plan of reorganization without an interim infusion in the form of a DIP lending facility.

2.      Aquarryum LLC (the "Proposed DIP Lender") is an affiliate of the Debtors in that the Proposed DIP Lender is owned by the current owners of the Debtors.  The Debtors are early-stage companies seeking both to lease portions of their facilities to warehouse tenants and to develop a data center on the premises of debtor 1528 CC Rd LLC (herein, "1528").  The data center business is pre-revenue and, as such, the circumstances do not qualify the Debtors for traditional or DIP financing of

their bankruptcy cases from unrelated third-party lenders; therefore, searching for a non-insider DIP lenders would be futile at this stage. The Proposed DIP Lender is the only third-party entity who is willing to provide the DIP financing in these cases.

3.      As such, the Debtors agreed to execute that certain term sheet (the "<u>DIP Term Sheet</u>"), with the Proposed DIP Lender. The Debtors understand that the DIP Term Sheet and the DIP Facility need to provide funding on terms that (a) are not onerous to the Debtors, and (b) serve the interests of the Debtors' creditors and stakeholders.

4.      The DIP Facility, coupled with the Debtors' ability to use Cash Collateral, provides the Debtors' best chance to maximize value for the Debtors' creditors and other stakeholders and is reasonable and fair. The Debtors believe that the DIP Facility provides sufficient runway to allow the Debtors to pursue and complete the value-maximizing Plan. The liquidity made available under the DIP Facility, coupled with the Debtors' access to Cash Collateral, signals to the Debtors' stakeholders that the Debtors have the liquidity necessary to continue operating while they complete a successful reorganization. Without the DIP Facility, the value of the Debtors' business and assets will quickly deteriorate, materially and irreparably harming the Debtors' estates. Therefore, the relief requested by this Motion is a necessary step to preserve the Debtors' operations and provide a bridge to a Plan that maximizes value for the Debtors' estates and their stakeholders.

5.      For these reasons, as well as for the reasons set forth in the *Declaration of Dominique Kostelac in Support of Debtors' Financing Motion* (the "<u>Kostelac Declaration</u>"), filed contemporaneously herewith, the Debtors believe that entry into the DIP Facility is an exercise of the Debtors' sound business judgment and will maximize value of their estates to the benefit of all of the Debtors' stakeholders. Accordingly, the Debtors respectfully request that the Court approve the Debtors' entry into the DIP Facility.

## **Relief Requested**

6.      The Debtors seek the entry of an interim order, substantially in the form attached hereto

as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order"),[1] including among

other things the following key provisions:[2]

(a)   authorizing the Debtors to obtain junior secured super priority debtor in possession financing on a subordinated priority basis (the "DIP Facility") pursuant to the terms and conditions of the DIP Term Sheet, attached hereto as **Exhibit B**, in the aggregate principal amount of up to $200,000.00 of new money, delayed draw term loans;

(b)   authorizing the Debtors to execute, deliver and perform under the DIP Term Sheet and all other loan documentation related to the DIP Facility (collectively, together with the DIP Term Sheet and any other loan documents, the "DIP Documents");

(c)   authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, any fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(d)   granting to the Proposed DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors;

(e)   granting to the Proposed DIP Lender, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof as set forth in the Interim Order, and, upon entry of the Final Order, any proceeds of litigation by the Debtors' estates against third parties, in each case subject to the liens and replacement liens of the pre-petition secured lenders;

(f)    authorizing the Debtors to use proceeds of the DIP Facility and the Cash Collateral (as defined in the Interim DIP Order) solely in accordance with the Interim Order and/or the DIP Documents;

(g)   subject to the restrictions set forth in the DIP Documents and the Interim DIP Order, authorizing the Debtors to use Cash Collateral (each term as defined in the Interim DIP Order), and provide adequate protection to the Prepetition Secured Lenders (as defined in the Interim DIP Order) for any diminution in value of their respective interests in the Prepetition Collateral, including, without limitation, any diminution in value resulting

---

[1]   The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

[2]   The summaries and descriptions of the terms and conditions of the DIP Facility as set forth in this Motion are qualified in their entirety by the terms of the Interim DIP Order, Final DIP Order and DIP Loan Documents.  Undefined terms used herein shall have the meanings ascribed to them in the Interim DIP Order, Final DIP Order, or DIP Loan Documents, as applicable.

from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral;

(h)   vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors, the Proposed DIP Lender, and the Prepetition Secured Lenders (as defined in the Interim DIP Order) to implement and effectuate the terms and provisions of the Interim DIP Order, the DIP Documents and, upon entry, the Final DIP Order and to deliver any notices of termination described below and as further set forth herein;

(i)   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim DIP Order and, upon entry, the Final DIP Order; and

(j)   scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final DIP Order (a) through (d) (collectively, the "Requested Relief").

## JURISDICTION AND VENUE

7.   This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.   The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.   The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**I.   General Background.**

10.   On July 14, 2025 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors are operating their businesses as

4

debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

11.     The Debtors filed these cases to prevent the foreclosure sale scheduled for July 15, 2025, by the Prepetition Secured Lenders of their liens in and to the real estate owned by the Debtors.

**II.     The Prepetition Capital Structure.**

12.     The most significant sources of the Debtors' secured and unsecured indebtedness are identified and described below (collectively the "Prepetition Secured Obligations").

**A.     1524 CC Rd LLC.**

13.     On July 13, 2023, 1524 as borrower and Exchangers, LTD ("Exchangers") entered into a *Balloon Promissory Note* in the original principal amount of $230,000, requiring monthly interest-only payments until the entire unpaid principal and interest amount became due on July 15, 2025 (the "1524 Purchase Money Facility").

14.     As security for 1524's repayment obligations under the 1524 Purchase Money Facility, 1524 granted Exchangers a first priority lien in 1524's real estate located at 1524 Country Club Road in Harrisonburg, Virginia (the "1524 Real Estate") as more particularly set forth in that certain Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in Deed Book 5714, Page 383 (the "1524 Purchase Money Deed of Trust").

15.     Also on July 13, 2023, 1524 as borrower and Roosevelt Road Holdings, LLC ("Roosevelt Road") entered into a *Promissory Note* (the "Roosevelt Road Note") in the original principal amount of $500,000 for the purpose of purchasing the 1524 Real Estate and the real estate located at 1528 Country Club Road in Harrisonburg, Virginia (the "1528 Real Estate"). The Roosevelt Road Note required interest-only payments until December 1, 2023, and a final principal and interest payment due and payable in full on July 15, 2025.

5

16.     As security for the repayment of $100,000 of the Roosevelt Road Note, 1524 granted

Roosevelt Road a second-priority lien in the 1524 Real Estate pursuant to the terms of that certain

Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in

Deed Book 5714, Page 387 (the "Roosevelt Road Deed of Trust").

17.     Also on July 13, 2023, (a) 1524 and 1528 as Borrowers and Grantors; (b) Copperpen

LC as lender and seller under that certain *Contract for Purchase and Sale of Real Estate* dated June 9,

2023 for the purchase of the 1528 Real Estate; and (c) Roosevelt Road as lender, entered into an

*Intercreditor Agreement* (the "Intercreditor Agreement") "to provide for the right of RRH to purchase

the Copperpen Loan and related Copperpen Loan Documents in accordance with the terms described

herein."   The Intercreditor Agreement was recorded in the Clerk's Office of the Circuit Court of

Rockingham County, Virginia at Deed Bood 5714, Page 793.

18.     On or about October 5, 2023, Exchangers assigned its interest in the Prepetition Secured

Obligations to Copperpen, LC, as assignee and successor in interest ("Copperpen").   Copperpen was

the owner of the 1524 Real Estate from whom the Debtors acquired the property in 2023.

19.     On or about July 14, 2025, Copperpen assigned its interests in the Prepetition Secured

Obligations to Roosevelt Road, thereby establishing Roosevelt Road as the successor in interest to

Exchangers as to the 1524 Purchase Money Facility.

20.     As of the Petition Date, 1524 owed Roosevelt Road approximately $239,200 on account

of the Purchase Money Facility and $680,000 on the Roosevelt Road Note.

**B.     1528 CC Rd LLC.**

21.     On July 13, 2023, 1528 as borrower and Exchangers, LTD ("Exchangers") entered into

a *Balloon Promissory Note* in the original principal amount of $970,000, requiring monthly interest-

only payments until the entire unpaid principal and interest amount became due on July 15, 2025 (the

"1528 Purchase Money Facility").

22.    As security for 1528's repayment obligations under the 1528 Purchase Money Facility, 1528 granted Exchangers a first priority lien in the 1528 Real Estate as more particularly set forth in that certain Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in Deed Book 5714, Page 360 (the "1528 Purchase Money Deed of Trust").

23.    Also on July 13, 2023, 1528 as borrower and Roosevelt Road as lender entered into the Roosevelt Road Note for the purpose of purchasing the 1524 Real Estate and the 1528 Real Estate. The Roosevelt Road Note required interest-only payments until December 1, 2023, and a final principal and interest payment due and payable in full on July 15, 2025.

24.    As security for the repayment of $400,000 of the Roosevelt Road Note, 1528 granted Roosevelt Road a second-priority lien in the 1528 Real Estate pursuant to the Roosevelt Road Deed of Trust.

25.    Also on July 13, 2023, (a) 1524 and 1528 as Borrowers and Grantors; (b) Copperpen as lender and seller under that certain *Contract for Purchase and Sale of Real Estate* dated June 9, 2023 for the purchase of the 1528 Real Estate; and (c) Roosevelt Road as lender, entered into the Intercreditor Agreement, which was recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia at Deed Bood 5714, Page 793.

26.    On or about October 5, 2023, Exchangers assigned its interest in the Prepetition Secured Obligations to Copperpen, as assignee and successor in interest.  Copperpen was the owner of the 1528 Real Estate from whom the Debtors acquired the property in 2023.

27.    On or about July 14, 2025, Copperpen assigned its interests in the Prepetition Secured Obligations to Roosevelt Road, thereby establishing Roosevelt Road as the successor in interest to Exchangers as to the 1528 Purchase Money Facility.

28.    As of the Petition Date, 1528 owed Roosevelt Road $680,000 on the Roosevelt Road Note.

29.     As a result of the foregoing transactions, Roosevelt Road remains as the successor in interest with regard to the Prepetition Secured Obligations.  Although the Debtors reserve all rights with respect to a full and final determination of the amount of Roosevelt Road's claims, the Debtors acknowledge that Roosevelt Road holds a first priority lien on the real estate owned by the Debtors. For the purposes of this Motion, the Debtors state that the aggregate amount owed to Roosevelt Road on all its claims is at least $1,800,000.00 as of the Petition Date.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001**

27.     Pursuant to Bankruptcy Rule 4001(b), (c), and (d), the following is a concise summary highlighting the proposed material terms of the DIP Facility, as specified in the DIP Term Sheet and the Interim DIP Order:

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Obligors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrowers**: 1524 CC Rd LLC and 1528 CC Rd LLC, Debtors and Debtors-in-Possession<br><br>**Proposed DIP Lender**: Aquarryum LLC<br><br>*See* Interim DIP Order, Preamble (a). |
| **DIP Commitment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | **DIP Credit Facility:**<br><br>The DIP Facility is a junior secured debtor in possession term loan facility consisting of (i) a $200,000.00 new money term loan (the "DIP Loan Commitments") in the form of a delayed draw term loan facility, $10,000.00 of which shall be available to draw after the entry of the Interim DIP Order and establishment of the DIP Loan Account, and $190,000.00 of which shall be available to be drawn after the entry of the Final DIP Order (together, the "DIP Loans").<br><br>*See* Interim DIP Order, Preamble (a). |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | **Purpose:**<br>Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (as defined below), (a) to pay transaction costs, fees, and expenses which are incurred in connection with the DIP Facility, including all fees and costs incurred by professionals employed by the Proposed DIP Lender; and (b) for working capital and other general corporate purposes of the Debtors, all subject to the Approved Budget and certain restrictions to be set forth in the |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Interim DIP Order and/or Final DIP Order, as applicable, and the documents governing the DIP Facility. Neither proceeds of the DIP Facility nor Cash Collateral shall be used to pay administrative expense claims under section 503(b)(9) of the Bankruptcy Code. *See* DIP Term Sheet, "Purpose." |
| **Conditions of Closing and Borrowing** Fed. R. Bankr. P. 4001(c)(1)(B) | **Conditions Precedent:** The obligation of the Proposed DIP Lender to advance DIP Loans hereunder will be subject to satisfaction, or written waiver by the Proposed DIP Lender, of each of the following conditions precedent as of the date of each such advance (each a "<u>Funding Date</u>"): (a) the Interim DIP Order and the Final DIP Order, as applicable, shall have been entered by the Bankruptcy Court and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief therein provided; (b) the Bankruptcy Court shall have entered orders, interim and final, authorizing the Debtors to use the Prepetition Secured Lenders' cash collateral and such orders shall be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief therein provided; (c) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on and as of the applicable Funding Date, and the Debtors shall have established the DIP Loan Account; (d) no Event of Default (as defined below) under the DIP Facility or under any DIP Order shall have occurred and be continuing as of the applicable Funding Date, or shall exist after giving effect to the requested disbursement; (e) the Proposed DIP Lender shall be satisfied that the liens and security interests of the Proposed DIP Lender in the DIP Collateral (as defined in the Interim DIP Order) have been perfected by the DIP Orders and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in the DIP Term Sheet; (f) the Bankruptcy Court shall have ruled upon all such motions (whether made by the Proposed DIP Lenders or others), and issued all such orders in the Bankruptcy Cases as the Proposed DIP Lender may deem necessary or appropriate as a condition to funding of any DIP Loans; (g) no condition, event or circumstance arising subsequent to the Petition Date shall then exist which would be expected to have a material adverse effect on (i) the DIP Collateral or the Proposed DIP Lender's liens on the DIP Collateral or the priority of such liens, or (ii) the Proposed DIP Lender's rights and remedies under the DIP Term Sheet or any DIP Order; and (h) Proposed DIP Lender shall then be satisfied, in its sole discretion, that the continued funding of DIP Loans is reasonably likely to preserve and enhance the value of all Collateral for the purpose of facilitating an orderly disposition thereof. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | *See* DIP Term Sheet, "Conditions Precedent." |
| **Repayment Features/Provisions Limiting Repayment**<br><br>Bankruptcy Rule 4001(b)(1)(B) | **Mandatory Prepayments:**<br><br>Until such time as all DIP Obligations have been indefeasibly paid in full in cash, the Debtors shall remit to the Proposed DIP Lender 100% of the net cash proceeds (after any required payment of any liens, claims or encumbrances having priority over the DIP Liens (as defined below) including the Prepetition Secured Lenders, (as defined in the Interim DIP Order)) derived from:<br>(a) any sale or other disposition of any DIP Collateral, approved by the Bankruptcy Court, including any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code, simultaneously with the consummation thereof;<br>(b) any indemnity payments and insurance proceeds not included as proceeds of asset dispositions; and<br>(c) the proceeds received from the incurrence or issuance of indebtedness by any Debtor without the prior written consent of Proposed DIP Lender.<br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any insurance proceeds, asset sales or other proceeds described above shall be permitted without the prior written consent of the Proposed DIP Lender.<br><br>**Voluntary Prepayments:**<br><br>None.<br><br> *See* DIP Term Sheet, "Mandatory Prepayments" and "Voluntary Prepayments." |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Approved Budget:**<br>Attached to the DIP Term Sheet as Exhibit 1 is a thirteen-week operating budget for the Debtors outlining actual and anticipated expenses for which the Proposed DIP Lender has agreed to provide funding, subject to the terms of the DIP Term Sheet and the DIP Orders (the "<u>Approved Budget</u>"). Upon entry of the Interim DIP Order, the Proposed DIP Lender will advance the sum of $10,000.00 to the Debtors solely for payment of those expenses described in the Approved Budget. Thereafter, the Proposed DIP Lender shall make additional DIP Loans available from time to time, but not more frequently than once during any calendar week, upon the Debtor's written request, which shall be accompanied by (i) an itemization of all expenses set forth in the Approved Budget for which funding is then sought, and (ii) a reconciliation of the Approved Budget showing the application of all amounts previously disbursed and any actual or anticipated changes in budgeted expenses (collectively, a "<u>Draw Request</u>"). The Approved Budget may be revised from time to time in the sole discretion of the Proposed DIP Lender, provided that the Proposed DIP Lender shall at no time be obligated to consent to any change in the Approved Budget requested by the Debtors. Proceeds of the DIP Loans shall be maintained in a segregated bank account over |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | which the Proposed DIP Lender shall retain control, and which shall be subject to the DIP Liens (as defined in the DIP Term Sheet) in favor of the Proposed DIP Lender (the "DIP Loan Account"). Funds on deposit in the DIP Loan Account shall be available to the Debtors from time to time to be applied directly to the payment of amounts permitted to be paid under the Approved Budget as and when the same shall become due and payable, subject to the terms and conditions of this DIP Term Sheet and the DIP Orders. *See* DIP Term Sheet, "Approved Budget." |
| **Case Milestones** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B) | The Debtors shall be required to achieve the following milestones (collectively, the "Milestones") which may be extended or waived in writing by the Proposed DIP Lender, in its sole discretion: <br><br> • No later than October 22, 2025, the Debtors shall have filed the DIP Financing Motion and set for hearing on an interim basis; <br><br> • No later than October 29, 2025, the hearing on the approval of the Interim DIP Order approving the DIP Facility on an interim basis, in form and substance acceptable to the Proposed DIP Lender, shall go forward, unless otherwise directed by the Court; <br><br> • No later than November 19, 2025, the hearing on approval and entry of a Final DIP Order approving the DIP Facility on a final basis, in form and substance acceptable to the Proposed DIP Lender shall go forward, unless otherwise directed by the Court; <br> • No later than 90 days after the entry of the Final DIP Order, unless the Proposed DIP Lender and Roosevelt Road otherwise agree, the Debtors shall have filed a chapter 11 plan (the "Chapter 11 Plan") and disclosure statement, which shall be acceptable in form and substance to the Proposed DIP Lender; and <br> • No later than 120 days after the entry of the Final DIP Order, unless the Proposed DIP Lender and Roosevelt Road otherwise agree, the Bankruptcy Court shall have entered an order (the "Confirmation Order") confirming the Chapter 11 Plan, which Confirmation Order shall be in form and substance acceptable to the Proposed DIP Lender. <br> *See* DIP Term Sheet, "Milestones." |
| **DIP Financing Maturity Dates** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B) | **DIP Loan Maturity Date:** <br> The DIP Loan shall be due and payable upon the earliest of (i) the date that is nine months after the Petition Date, (ii) the closing date of a sale of substantially all of the Debtors' assets, (iii) the Chapter 11 Plan (as defined below) effective date, (iv) the date of dismissal of the chapter 11 cases or conversion to chapter 7, (v) the acceleration of the DIP Facility following an Event of Default, and (vi) at |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | the Proposed DIP Lender's option, the failure of Debtors timely to satisfy any Milestone (as defined below).<br><br>*See* DIP Term Sheet, "Maturity Date." |
| **Interest Rate**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | **Interest:**<br><br>12.00% per annum on the DIP Loans, payable in kind, which shall be paid in cash on the date on which any DIP Loans are repaid or prepaid, at the DIP Loan Maturity Date (as defined in the DIP Term Sheet) and/or upon the acceleration of the DIP Facility.<br><br>All interest shall be calculated as simple interest on the basis of a 360-day year for the actual number of days elapsed.<br>**Default Rate:**<br><br>Following the occurrence and during the continuance of an Event of Default (and after giving effect to any applicable notice or grace periods), all amounts due in respect of the DIP Obligations shall bear interest at the rate of twelve percent (12.00%) per annum.<br><br>*See* DIP Term Sheet, "Interest." |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(v), (x) | The occurrence of any of the following shall constitute an "Event of Default":<br>(a) the entry of an Interim DIP Order in form or substance that is not reasonably acceptable to the Proposed DIP Lender in its sole discretion; or entry of a Final DIP Order that is not reasonably acceptable to the Proposed DIP Lender in its sole discretion;<br>(b) failure to pay principal DIP Obligations in full when due, including without limitation, on the Maturity Date (as defined in the DIP Term Sheet);<br>(c) failure to pay interest, fees or other amounts in full within three (3) business days after the date due following written notice, including without limitation, on the Maturity Date;<br>(d) failure of any representation, warranty or certification to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;<br>(e) failure by any Debtor to be in compliance in all material respects with the provisions of the DIP Term Sheet, any DIP Order or any other order of the Bankruptcy Court following five (5) business days' written notice and an opportunity to cure;<br>(f) dismissal of any of the Debtors' bankruptcy cases (the "Bankruptcy Cases");<br>(g) the appointment in any of the Bankruptcy Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor, without the prior written consent of the Proposed DIP Lender;<br>(h) failure of any Milestones to be satisfied by the specified deadline therefor; |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | (i) the filing of any application by any Debtor for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code, other than any Section 507(b) claims granted by or permitted in the DIP Orders; <br><br> (j) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Bankruptcy Cases with respect to any portion of the DIP Collateral with an aggregate value exceeding $25,000 without the prior written consent of the Proposed DIP Lender; or <br><br> (k) any creditor or party in interest commences (or supports) any action against the Proposed DIP Lender to subordinate or avoid any liens granted hereunder or under any DIP Order in favor of the Proposed DIP Lender. <br> *See* DIP Term Sheet, "Events of Default." |
| **Security and Priority Status** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(i) | **DIP Superpriority Claims:** <br> Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with, to the fullest extent permitted under the Bankruptcy Code or other applicable law, priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof including. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent permitted by law. The DIP Superpriority Claims shall be *pari passu* in right of payment with one another, senior to the 507(b) Claims (as defined herein), and subordinated only to the Carve-Out (as defined below). <br> **Liens on DIP Proceeds:** <br> As security for the DIP Obligations, effective automatically and properly perfected upon entry of the Interim DIP Order, is granted continuing, valid, binding, enforceable, non-avoidable, automatically perfected, post-petition security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the DIP Secured Lenders, pursuant to the Interim Order and the DIP Documents, the "<u>DIP Liens</u>") on all property identified in and according to the priority set forth in clauses (a) through (e) of paragraph 6 of the Interim DIP Order. <br> *See* Interim DIP Order, ¶¶ 5, 6. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Cash Collateral**<br>Fed. R. Bankr. P. 4001(b)(1)(B) | **Use of Cash Collateral:**<br>The Debtors are authorized, subject to the terms and conditions of the Interim DIP Order, to use Cash Collateral in accordance with the DIP Documents and the Approved Budget; *provided that* (a) the Prepetition Secured Lenders are granted the Adequate Protection as set forth in paragraph 10 of the Interim DIP Order; and (b) except on the terms and conditions of the Interim DIP Order, the Debtors shall be enjoined and prohibited from at any times using Cash Collateral absent further order of the Court.<br>*See* Interim DIP Order, ¶¶ 8, 10. |
| **Carveout**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | **Carve-Out:**<br><br>The term "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any official Creditors' Committee (the "Estate Professionals") at any time on or before the first business day following delivery by the Proposed DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice up to but not in excess of the amount approved in the Approved Budget for each such Estate Professional (whether to be actually paid or to be accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "Pre-Carve-Out Trigger Notice Amount"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the Proposed DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $75,000 for the Debtors' professionals and $25,000 for professionals of any official Creditors' Committee (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). Nothing herein shall limit the ability of any Estate Professional to seek payment of any allowed fees and expenses as an administrative expense in these Bankruptcy Cases. For purposes of this Interim Order, the "Carve-Out Trigger Notice" shall mean a written notice (which may be made via electronic mail or other electronic means) delivered by the Proposed DIP Lender) to the Debtors and their counsel, Woods Rogers Vandeventer Black PLC, stating that the Trigger Notice Cap has been invoked. The Carve-Out Trigger Notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.<br>**Priority of Carve-Out:** |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Each of the DIP Liens and the DIP Superpriority Claims (as defined below) shall be subject and subordinate to payment of the Carve-Out.<br><br>*See* Interim DIP Order, ¶ 4. |
| **Right to File Plan** Fed. R. Bankr. P. 4001(c)(1)(B)(v) | The Milestones contemplate that no later than 180 days after the Petition Date, unless the Proposed DIP Lenders otherwise agree, the Debtors shall have filed the Chapter 11 Plan and disclosure statement, which shall be acceptable in form and substance to the Proposed DIP Lenders.<br><br>*See* DIP Term Sheet, "Milestones." |
| **Modification of the Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The Automatic Stay in the Chapter 11 Cases otherwise applicable to the Proposed DIP Lender is modified so that the Proposed DIP Lender, shall be entitled to exercise all of its rights and remedies in accordance with the DIP Documents and the Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, including but not limited to (1) enforcing any and all rights against DIP Collateral, and (2) taking any other actions or exercise any other rights or remedies permitted under the Interim Order, the DIP Documents or applicable law.<br><br>*See* Interim DIP Order, ¶ 7.<br><br>The Debtors, the DIP Secured Parties and the Prepetition Secured Lenders are authorized to take all actions as are necessary or appropriate to implement the terms of the Interim DIP Order. In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in the Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 21. |

**BASIS FOR RELIEF REQUESTED**

I.    **The Debtors Should Be Authorized to Obtain Junior Secured, Super Priority DIP Financing.**

28.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully complete their reorganization hinges upon them being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  *See* 11 U.S.C. § 364(c).

A.    **The Debtors Have Exercised Their Sound Business Judgment in Entering into the Proposed DIP Facility.**

29.    The Debtors do not have access to traditional capital markets because the data center business is pre-revenue;  therefore, the Debtors have concluded that the proposed DIP Facility is the best alternative available under the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not

'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

30.    To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business judgment when the decision involves a "business judgment made in good faith upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Curlew Valley Assocs.*, 14 B.R. at 513 (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *Farmland Indus.*, 294 B.R. at 886 ("Viewed in isolation,

several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the Proposed DIP Lenders. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable*."); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

31.    Here, as described in the Kostelac Declaration, the Debtors' determination to enter into the DIP Facility was a business decision guided by the Debtors' financial needs to maximize value for the Debtors' estates and maintain positive ordinary course relations with creditors and vendors. Specifically, the Debtors and their advisors determined that the Debtors would require additional liquidity to continue operating the Debtors' businesses while they pursue a value-maximizing reorganization plan.

32.    The Debtors understand that seeking traditional market financing is not an option to the Debtors; therefore, the only source of funding is the Proposed DIP Lender, an entity owned by the owners of the Debtors.

33.    Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' stakeholders, is necessary to preserve the value of the estates' assets and is an exercise of the Debtors' sound and reasonable business judgment.

## B.    The DIP Loan Documents Are Appropriate Under Section 364.

34.    Section 364 of the Bankruptcy Code distinguishes between (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Section 364(c)

of the Bankruptcy Code, a court may authorize a debtor in possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing.

35.     As a condition to entering into the DIP Facility and obtaining the needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c) of the Bankruptcy Code, to grant (a) the Proposed DIP Lenders automatically perfected security interests in and liens upon all of the DIP Collateral and (b) allowed superpriority administrative expense claims to the Proposed DIP Lenders.

36.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

**C.      The Debtors Were Unable to Obtain Necessary Postpetition Financing on  an Unsecured Basis Under 11 U.S.C. § 364(a) or (b).**

37.      As set forth in the Kostelac Declaration, the Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

38.      To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

39.      As stated above, the Debtors contacted other potential financing sources and the Proposed DIP Lender offered the only available financing under the circumstances.  The Debtors believe the DIP Facility reflects the most favorable terms on which the Debtors are currently able to obtain postpetition financing, and that the Debtors could not obtain financing without granting the liens in the priority described herein.

**D.      The Rates and Fees of the DIP Loan Documents Are Reasonable.**

40.      Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the Proposed DIP Lender as more fully described

herein.  The collateral terms, covenants, interest rates, and fees under the DIP Loan Documents were subject to negotiation and required by the Proposed DIP Lender and thus are an integral component of the overall terms of the DIP Facility.  The Debtors considered the fees when determining, in their sound business judgment, whether the DIP Facility constituted the best terms on which the Debtors could obtain sufficient debtor in possession financing.  Under the circumstances, the interest rates and fees reflected in the DIP Loan Documents are reasonable and substantially in line with other debtor in possession financings generally.  Thus, the Debtors believe paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.

## II.   The Debtors Request for Use of Cash Collateral and the Proposed Adequate Protection Is Appropriate.

41.     Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's Cash Collateral. Section 363(c) provides, in pertinent part, that: "The trustee may not use, sell, or lease cash collateral . . . unless—(A) each entity that has an interest in such cash collateral consents[.]"

42.     During the interim period under the Interim DIP Order, the Debtors only intend to use cash collateral under the Prepetition Secured Lenders' loan documents, and the Debtors propose to provide adequate protection for the use of such cash collateral by granting the Prepetition Secured Lenders a replacement lien in the Debtors' post-petition rents.  The Debtors intend to reach an agreement with the Prepetition Secured Lenders to cover certain budget items, and should such an agreement be reached, the Debtors' use of the Prepetition Secured Lenders' cash collateral will be consensual.

43.     Out of an abundance of caution, should the Debtors and the Prepetition Secured Lenders fail to reach an agreement for the use of cash collateral under the Prepetition Secured

Lenders' loan documents, the Debtors reserve all rights to petition the Court for authorization to use such cash collateral during the Final Hearing. Should the Debtors make a request for the non-consensual use of cash collateral, the Debtors will provide the Prepetition Secured Lenders with adequate protection in the form of superpriority administrative expense claims, and payment of reasonable fees and expenses, which (i) is fair and reasonable and (ii) adequately protects against the diminution in value of the Prepetition Secured Lenders collateral under the Prepetition Secured Lenders' loan documents.

**III.    The Proposed DIP Lender Should be Deemed Good Faith Lender.**

44.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. ¶ 364(e).

45.     Here, the DIP Loan Documents embody the best terms on which the Debtors could currently obtain DIP financing under the circumstances. All negotiations regarding the provisions of the DIP Facility were conducted in good faith and on an arm's-length basis. The terms and conditions of the DIP Facility are reasonable. Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein. Accordingly, the Court should find that

the Proposed DIP Lenderis a "good faith" lender within the meaning of section 364(e) of the

Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.    The Scope of the Carve-Out Is Necessary and Appropriate.

46.    Without the Carve-Out (as defined in the Interim DIP Order), the Debtors and other

parties-in-interest may be deprived of certain rights and powers because the services for which

professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carveouts for

professionals representing parties-in-interest because "[a]bsent such protection, the collective

rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not

directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and

powers. Additionally, the Carve-Out ensures that assets will be available for the Office of the

United States Trustee, and professional fees of the Debtors and an unsecured creditors committee,

if one is appointed. Accordingly, the Carve-Out is necessary and appropriate, and should be

approved.

## V.    Modification of the Automatic Stay.

47.    By this Motion, the Debtors are requesting modification of the automatic stay with

respect to the Proposed DIP Lender as necessary to effectuate the provisions of the Interim DIP

Order. The Debtors believe that these provisions are required for the Debtors to obtain the DIP

Facility and use Cash Collateral as provided in the Interim DIP Order.

48.    Stay modification provisions of this kind are ordinary and standard terms of

postpetition use of collateral by debtors-in-possession, and, in the Debtors' business judgment, are

reasonable and necessary under the present circumstances. *See, e.g., In re Royal Interco,* LLC,

No. 25-10674 (TMH) (Bankr. D. Del. May 5, 2025); In *re SiO2 Medical Prods., Inc.*, No. 23-10366

(JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the

terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022); *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022) (terminating automatic stay after occurrence of event of default and applicable notice); *In re Stimwave Techs. Inc.*, Case No. 22-10541 (KBO) (Bankr. D. Del. July 14, 2022) (same).

49.     Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim DIP Order.

**VI.    The Milestones Under the Proposed DIP Facility Are Reasonable.**

50.     The DIP Facility contemplates, as a product of negotiation with and as required by the Proposed DIP Lender as a condition to providing the DIP Facility, the Debtors must meet certain Milestones throughout these chapter 11 cases, the failure of which would constitute an Event of Default.  These Milestones were required by the Proposed DIP Lender as a condition to providing the DIP Facility.

51.     The DIP Facility, including the Milestones, serves as an important component of these chapter 11 cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while consummating the proposed sale, subject to identifying higher or better offers.  The continued and viable operation of the Debtors' businesses would not be possible absent access to the DIP Facility.  The DIP Facility, and the Debtors' ability to achieve the Milestones contemplated therein, will prevent interruptions to the Debtors' businesses, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate the plan of reorganization to maximize the value of their estates.

## VII.    Interim Approval of the DIP Facility.

52.       Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 or to obtain credit under Bankruptcy Code section 364 be commenced no earlier than 14 days after the service of such motion.  Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.       As described in the Kostelac Declaration, denial of immediate use of Cash Collateral and access to the DIP Facility will cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of their creditors and other stakeholders.  *See* First Day Decl. ¶ 38.

54.       Accordingly, the Debtors respectfully request that the Court conduct an expedited hearing on the Motion and authorize the Debtors from the entry of the Interim DIP Order until the Final Hearing to use Cash Collateral and obtain credit under the terms of the DIP Loan Documents.

## VIII.    Request for a Final Hearing.

55.       Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is no later than twenty-one (21) days after the entry of the Interim DIP Order and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.  The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further requests that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## WAIVER OF BANKRUPTCY RULE 6004(h)

56.    The Debtors request a waiver of any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h).  As explained above and in the Kostelac Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

### Notice

58.    Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) all parties identified on the respective Lists of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors in each of these jointly-administered cases pursuant to Bankruptcy Rule 1007(d); (iii) Roosevelt Road Holdings, LLC; and (iv) any party that has filed a request for notice with the Court.  The Debtors submit that, under the circumstances, no other or further notice of the Motion is required.

### No Prior Request

59.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court (a) authorize the Debtors to enter into and incur credit pursuant to the terms of the DIP Facility described in this Motion; (b) enter the Interim DIP Order; (c) set a final hearing to consider, approve, and enter the Final DIP Order; and (d) grant such other and further relief as is just and proper.

Dated: October 22, 2025        Respectfully submitted,

/s/ *Brian H. Richardson*
Michael E. Hastings (VSB No. 36090)
Brian H. Richardson  (VSB No. 92477)
WOODS ROGERS VANDEVENTER BLACK PLC
10 S. Jefferson Street, Suite 1800
Roanoke, Virginia 24011
T:  540-983.7568
F:  540-322-3417
michael.hastings@woodsrogers.com
brian.richardson@woodsrogers.com

*Counsel for the Debtors and*
 *Debtors in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2025, the foregoing was filed electronically with the U.S. Bankruptcy Court and was served electronically on all parties requesting electronic service in this case by the CM/ECF system, and via first-class mail, postage prepaid on all parties listed and identified in the Debtors' respective Lists of Creditors Holding the 20 Largest Unsecured Claims in each of these jointly-administered cases.

/s/ *Brian H. Richardson*

## EXHIBIT A

**Proposed Interim DIP Order**

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
(Harrisonburg Division)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| 1524 CC RD LLC, *et. al.,* | ) | |
| | ) | Case No. 25-50402 |
| Debtors. | ) | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN JUNIOR
SECURED POST-PETITION FINANCING AND (B) USE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING
A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "<u>DIP Motion</u>")[1] of the above captioned debtors and debtors in

possession (the "<u>Debtors</u>") seeking relief, pursuant to sections 105, 361, 362, 363(b), 363(c)(2),

363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 503, 506(c) and 507 of title 11 of the United States

Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1 and 9013-1

of the Local Rules of the United States Bankruptcy Court for the Western District of Virginia (the

"<u>Local Rules</u>"), seeking entry of this interim order (this "<u>Interim Order</u>") among other things:

---

[1]    Capitalized terms used but not defined herein are given the meanings ascribed thereto in the DIP Loan
Agreement (as defined herein) or the DIP Motion, as applicable.

(a) authorizing the Debtors to obtain junior secured super priority debtor in possession financing on a subordinated priority basis (the "DIP Facility") pursuant to the terms and conditions of the DIP Term Sheet, attached hereto as Exhibit B, in the aggregate principal amount of up to $200,000 of new money, delayed draw term loans;

(b) authorizing the Debtors to execute, deliver and perform under the DIP Term Sheet and all other loan documentation related to the DIP Facility (collectively, together with the DIP Term Sheet and any other loan documents, the "DIP Documents");

(c) authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, any fees payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(d) granting to the Proposed DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors;

(e) granting to the Proposed DIP Lender, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all prepetition and post-petition property of the Debtors' estates and all proceeds thereof as set forth in the Interim Order, and, upon entry of the Final Order, any proceeds of litigation by the Debtors' estates against third parties, in each case subject to the liens and replacement liens of the pre-petition secured lenders;

(f) authorizing the Debtors to use proceeds of the DIP Facility and the Cash Collateral (as defined in this Interim Order) solely in accordance with this Interim Order and/or the DIP Documents;

(g) subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use Cash Collateral (each term as defined in the Interim DIP Order), and provide adequate protection to the Prepetition Secured Lenders (as defined in this Interim Order) for any diminution in value of their respective interests in the Prepetition Collateral, including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral;

(h) vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors, the Proposed DIP Lender, and the Prepetition Secured Lenders (as defined in this Interim Order) to implement and effectuate the terms and provisions of this Interim DIP Order, the DIP Documents and, upon entry, the Final DIP Order and to deliver any notices of termination described below and as further set forth herein;

(i) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final DIP Order; and

(j) scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final DIP Order approving, on a final basis, the DIP Facility

and the Debtors' use of Cash Collateral consistent with the DIP Motion and this Interim Order.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Dominique Kostelac in Support of Debtors' Financing Motion* (the "Kostelac Declaration"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on October 29, 2025, (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    *Petition Date.* On July 14, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court"). On September 3, 2025, this Court entered an order approving the joint administration of the Chapter 11 Cases.

3

B.    _Debtors in Possession._ The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    _Jurisdiction and Venue._ This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the _Standing Order of Reference from the United States District Court for the Western District of Virginia,_ dated July 24, 1984. Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    _Committee Formation._ As of the date hereof, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee"). The U.S. Trustee has certified that no Creditors' Committee was formed in connection with these now-jointly administered cases. (Case No. 25-50402, ECF Doc. No. 42; Case No. 25-50403, ECF Doc. No. 42).

E.    _Notice._ The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Interim Hearing and the DIP Motion has been provided to all necessary parties in interest, including to all known prepetition lienholders and secured claimants holding senior priority liens under the Prepetition Secured Obligations (as defined in the DIP Motion) (collectively, the "Prepetition Secured Lenders") in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Interim Hearing was required.

4

F.    *Cash Collateral.* As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Lenders, and the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. The term "DIP Loan Proceeds" as used herein shall mean all cash borrowed under and funds advanced pursuant to the DIP Facility, which monies (i) shall and hereby constitute or will constitute "cash collateral" of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code, (ii) shall be held in a segregated debtor in possession deposit account designated as the "DIP Loan Account," and (iii) shall not otherwise be co-mingled with any other cash of the Debtors.

G.    *Debtors' Stipulations.* The Debtors admit, and after entry of the Final Order, stipulate and agree that:

(i)    *Prepetition Secured Loans.* Roosevelt Road Holdings, LLC, ("Roosevelt Road") is the holder and/or successor in interest to each of that certain: (a) *Balloon Promissory Note* dated as of July 13, 2023 in the original principal amount of $230,000 (the "1524 Purchase Money Facility"); (b) *Promissory Note* dated as of July 13, 2023, in the original principal amount of $500,000 (the "Roosevelt Road Note"); and (c) *Balloon Promissory Note* dated as of July 13, 2023 in the original principal amount of $970,000 (the "1528 Purchase Money Facility" and together with the 1524 Purchase Money Facility and the Roosevelt Road Note, the "Prepetition Secured Loans").

(ii)    *Prepetition Deeds of Trust.* Roosevelt Road is the beneficiary and/or successor in interest to each of the following deeds of trust which secure repayment of the Prepetition Secured Loans (a) Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in Deed Book 5714, Page 383 (the "1524 Purchase Money Deed

5

of Trust"); (b) Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in Deed Book 5714, Page 387 (the "Roosevelt Road Deed of Trust"); and (c) Deed of Trust recorded in the Clerk's Office of the Circuit Court of Rockingham County, Virginia, in Deed Book 5714, Page 360 (the "1528 Purchase Money Deed of Trust" and together with the 1524 Purchase Money Deed of Trust and the Roosevelt Road Deed of Trust, the "Prepetition Deeds of Trust").  The Prepetition Deeds of Trust were duly recorded against certain real property of the Debtors located in the City of Harrisonburg, Virginia at 1524 Country Club Road, and 1528 Country Club Road, (collectively, the "Real Estate").

        (iii)        *Debtor Benefit*. The Prepetition Secured Lenders extended the Prepetition Secured Loans to and for the benefit of the Debtors.

        (iv)        *Prepetition Term Loan Obligations*. While the Debtors reserve the right to challenge or object to certain fees and costs alleged in the proof of claim filed by Roosevelt Road, as the only known claimant of the Prepetition Secured Lenders, The Debtors stipulate and acknowledge that they are justly and lawfully indebted and liable to the Prepetition Secured Lenders without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount as of the Petition Date of not less than $1,800,000.00 under the Prepetition Secured Loans, plus accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Secured Loans.

6

(v)    *Prepetition Liens*. The Prepetition Deeds of Trust constitute valid, binding, non-avoidable, properly perfected and enforceable continuing liens on and security interests in the Real Estate and other collateral as set forth in the Prepetition Secured Loans and Prepetition Deeds of Trust (including Cash Collateral), which also include provisions for an assignment of rents with respect to rental income generated by the Debtors' use of the Real Estate (collectively, the "Prepetition Collateral").

(vi)    *Default by the Debtors*. The Debtors acknowledge and stipulate that they have been and are in default of their obligations under the Prepetition Secured Loans, including certain Events of Default under the Prepetition Secured Loans and Prepetition Deeds of Trust which have occurred thereunder.

(vii)    *No Control*. None of the Prepetition Secured Lenders control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Loans.

H.    *Corporate Authority*. Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

I.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Documents.

(ii)    The Debtors have an immediate and critical need to obtain the DIP Facility and to use the Prepetition Collateral (including Cash Collateral) in order to, among other things

7

(a) administer and preserve the value of their estates; (b) permit the orderly continuation of the operation of their business, (c) maintain business relationships with vendors, suppliers and customers, (d) satisfy other working capital and operational needs, (f) make Adequate Protection (defined below) payments to Roosevelt Road; and (g) fund expenses of the Chapter 11 Cases. In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the value of the Debtors' going concern and to a successful sale of all or substantially all of the Debtors' assets.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Lender, the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    Based on the DIP Motion, the Kostelac Declaration and the record presented to the Court at the Interim Hearing, the extension of credit under the DIP Facility, the terms of the adequate protection granted to the Prepetition Secured Lenders as provided in paragraph 10 of this Interim Order (the "Adequate Protection"), and the terms on which the Debtors may use the

8

Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)     The DIP Facility, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith by the Debtors, the DIP Lender, and the Prepetition Secured Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents, including, without limitation: all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Lender and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent permitted by law.

(vi)     The Prepetition Secured Lenders have acted in good faith regarding the DIP Facility and the Debtors' use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Lenders (and the successors and assigns thereof) each shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event

that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent permitted by law.

(vii)     The Prepetition Secured Lenders are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) is fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including Cash Collateral); and the Prepetition Secured Lenders have consented or are deemed hereby to have consented to the use of the Prepetition Collateral (including Cash Collateral) and the subordinated junior liens established by the DIP Liens pursuant to the terms set forth in this Interim Order and the DIP Documents; *provided that* nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by the Prepetition Secured Lenders for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Facility authorized by this Interim Order or (z) prejudice, limit or otherwise impair the rights of the Prepetition Secured Lenders to seek new, different or additional adequate protection or assert any rights of the Prepetition Secured Lenders (subject in all respects to the terms of this Interim Order), and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(viii)      The Debtors have prepared and filed an initial budget (the "Initial DIP Budget"), attached hereto as Exhibit 2. The Initial DIP Budget reflects, among other things, the DIP Borrower's and its subsidiaries' anticipated sources and uses of cash for each calendar week, in form and substance satisfactory to the DIP Lender. The Initial DIP Budget may be modified, amended, extended and updated from time to time in accordance with the DIP Loan Agreement and this Interim Order, and once approved by the DIP Lender, shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute, without duplication and without the need to re-file on the public docket, an "Approved Budget"). The Initial DIP Budget is reasonable under the facts and circumstances.

J.      *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2) and 6003. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the use of Cash Collateral in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

K.      *Continuation of Prepetition Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged prepetition lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Secured Parties, or the Prepetition Secured Lenders, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged prepetition lien and/or security interests, except with respect to those express stipulations made by the Debtors with respect to the Prepetition Secured Lenders. The Prepetition Deeds of Trust, and the DIP Liens are continuing liens and the DIP Collateral is and will continue

to be encumbered by such liens until indefeasible payment in full of all Prepetition Secured Loans

and all DIP Obligations, respectively, in light of the integrated nature of the DIP Facility, the DIP

Documents, and the Prepetition Secured Loans.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before

the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause

appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      _Motion Granted_. The relief sought in the DIP Motion is granted as set forth herein,

on an interim basis. The interim financing described herein is authorized and approved, and the

use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and

conditions set forth in the DIP Documents and this Interim Order. All objections to entry of this

Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and

overruled on the merits.  The rights of all parties in interest to object to the entry of a Final Order

are fully reserved.

2.      _Authorization of the DIP Facility and the DIP Documents_.

(a)      The Debtors are hereby authorized to execute, deliver, enter into and, as

applicable, perform all of their obligations under the DIP Documents and such other and further

acts as may be necessary, appropriate or desirable in connection therewith, and the DIP Loan

Agreement is incorporated into this Interim Order as if set forth herein.  The DIP Borrower is

hereby authorized to borrow money pursuant to the DIP Term Sheet, subject to any limitations on

borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP

Documents (and subject to and in accordance with the Approved Budget) (subject to any permitted

variances).  Upon entry of this Interim Order, as provided in the Interim DIP Budget, the Debtors

are authorized to use proceeds of the DIP Loans to pay the DIP Fees and Expenses (as defined below).

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Lender may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments, the fees or the rate of interest payable thereunder; _provided_ that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the Debtors under the DIP Documents shall not, for purposes of this Interim Order or any Final Order, be considered

13

amendments or modifications to the Approved Budget or the DIP Documents that require further approval of this Court;

(iii)      the non-refundable payment to the DIP Secured Parties of all fees, premiums and rights received as consideration under or in connection with the DIP Facility (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Term Sheet or DIP Documents (or in any separate letter agreements) and the costs and expenses as may be due from time to time, including, without limitation, the fees and expenses of the professionals retained by, or on behalf of, the DIP Lender in each case, as provided for in the DIP Documents (collectively, the "DIP Fees and Expenses"), without the need to file retention motions or fee applications; and

(iv)      the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

14

3.      _DIP Obligations_. Upon execution and delivery of the DIP Documents, and entry of

this Interim Order, the DIP Documents shall constitute legal, valid, binding and non-avoidable

obligations of the Debtors, enforceable against each Debtor and its estate in accordance with the

terms of the DIP Documents and this Interim Order, and any successors thereto, including any

trustee appointed in the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code

upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or

related to any of the foregoing (collectively, the "Successor Cases"). Upon execution and delivery

of the DIP Documents, and entry of this Interim Order, the DIP Obligations will include all loans

and any other indebtedness or obligations, contingent or absolute, which may now or from time to

time be owing by any of the Debtors to the DIP Lender, in each case, under, or secured by, the DIP

Documents or this Interim Order, including all principal, interest, costs, fees, expenses, premiums,

indemnities and other amounts under the DIP Documents (including this Interim Order). The

Debtors shall be jointly and severally liable for the DIP Obligations. Except as permitted hereby,

no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the

DIP Lender (including authorized representatives) shall be stayed, restrained, voidable, avoidable,

or recoverable, under the Bankruptcy Code or under any applicable law (including, without

limitation, under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code or under any

applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform

Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense,

avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether

equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim,

or any other challenge under the Bankruptcy Code or any applicable law or regulation by any

person or entity.

15

4.        *Carve-Out*.

(a)       *Carve-Out*. The term "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any official Creditors' Committee (the "Estate Professionals") at any time on or before the first business day following delivery by the Proposed DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice up to but not in excess of the amount approved in the Approved Budget for each such Estate Professional (whether to be actually paid or to be accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "Pre-Carve-Out Trigger Notice Amount"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the Proposed DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $75,000 for the Debtors' professionals and $25,000 for professionals of any official Creditors' Committee (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").  Nothing herein shall limit the ability of any Estate Professional to seek payment of any allowed fees and expenses as an administrative expense in

16

these Bankruptcy Cases.  For purposes of this Interim Order, the "<u>Carve-Out Trigger Notice</u>" shall mean a written notice (which may be made via electronic mail or other electronic means) delivered by the Proposed DIP Lender) to the Debtors and their counsel, Woods Rogers Vandeventer Black PLC, stating that the Trigger Notice Cap has been invoked. The Carve-Out Trigger Notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.

(b)      *Priority of Carve-Out*. Each of the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be subject and subordinate to payment of the Carve-Out.

5.      *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations for funds <u>actually advanced</u> to the Debtors under the DIP Facility and deposited into the DIP Loan Account shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with, to the fullest extent permitted under the Bankruptcy Code or other applicable law, priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and shall be payable from all prepetition and postpetition property of the Debtors and all proceeds

thereof and, subject to and upon entry of the Final Order granting such relief, Avoidance Action

Proceeds (as defined below).  The DIP Superpriority Claims shall be entitled to the full protection

of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision

hereof is vacated, reversed or modified, on appeal or otherwise, all to the maximum extent

permitted by law. The DIP Superpriority Claims shall be *pari passu* in right of payment with one

another, senior to the 507(b) Claims (as defined herein), and subordinated to the Carve-Out.

6.      *DIP Liens.* As security for the DIP Obligations, effective and automatically and

properly perfected upon the date of this Interim Order, and without the necessity of the execution,

recordation or filing by the Debtors or the DIP Lender of mortgages, security agreements, control

agreements, pledge agreements, financing statements, intellectual property filings or other similar

documents, notation of certificates of title for titled goods or other similar documents, instruments,

deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any

Collateral, and without any further action by the DIP Lender, the DIP Lender is hereby granted,

pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, continuing, valid, binding,

enforceable, non-avoidable, automatically perfected, post-petition security interests and liens (all

security interests and liens granted to the DIP Lender pursuant to this Interim Order and the DIP

Documents, the "DIP Liens") on all property identified in and according to the priority set forth in

clauses (a) through (e) below (collectively referred to as the "DIP Collateral"). Notwithstanding

the foregoing, the DIP Liens shall not extend to and the DIP Collateral shall not consist of assets,

contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach

to such property, in which case the proceeds of such assets, contracts, leases and other licenses

shall be DIP Collateral. The DIP Collateral further excludes claims and causes of action under

sections 544, 545, 547, 548 and 550 of the Bankruptcy Code or any other avoidance actions under

18

the Bankruptcy Code (collectively, "Avoidance Actions"), but subject to and upon entry of the

Final Order granting such relief, includes any proceeds or property recovered, unencumbered or

otherwise, from Avoidance Actions ("Avoidance Action Proceeds") in accordance with the DIP

Documents, this Interim Order, and the Final Order.

(a)     *Collateral*. As used herein, the term "Collateral" means all tangible and

intangible prepetition and postpetition property of the Debtors, whether existing on the Petition

Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, including,

without limitation, accounts, chattel paper, commercial tort claims, deposit accounts, documents,

equipment, general intangibles, goods (including fixtures), instruments, inventory, investment

property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities

accounts and lockboxes together with all money, cash, securities and other investment property on

deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting

obligations, real property interests (whether fee, leasehold, easement or mixed), books and records,

and to the extent not otherwise included, all substitutions, replacements, accessions, products and

other proceeds and products (whether tangible or intangible and including, without limitation,

insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit)

of any and all of the foregoing and all collateral security and guarantees given by any person with

respect to any of the foregoing.

(b)     *Liens on DIP Loan Proceeds*. Pursuant to section 364(c)(2) of the

Bankruptcy Code, the DIP Liens shall include, and the DIP Lender is hereby granted a valid,

binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien

upon all DIP Loan Proceeds, subject only to the Carve-Out. The Debtors are hereby ordered to and

19

shall (i) hold all DIP Loan Proceeds in the DIP Loan Account, and (ii) not otherwise co-mingle the

DIP Loan Proceeds with any other cash of the Debtors.

(c)      _Liens on Unencumbered Property._ Pursuant to section 364(c)(2) of the

Bankruptcy Code, the DIP Liens shall include and the DIP Lender is hereby granted a valid,

binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien

upon all Collateral that is not subject to (i) a valid, perfected and non-avoidable security interest

or lien or (ii) a valid and non-avoidable security interest or lien in existence as of the Petition Date

that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy

Code; whether arising under section 552(b) of the Bankruptcy Code or otherwise (the

"Unencumbered Property"). Unencumbered Property (y) shall not upon entry of this Interim Order

include Avoidance Actions and Avoidance Action Proceeds, but subject to and upon entry of the

Final Order granting such relief shall include Avoidance Action Proceeds.

(d)      _Liens Junior to Certain Other Liens._ Pursuant to section 364(c)(3) of the

Bankruptcy Code, the DIP Liens shall include and the DIP Lender is hereby granted a valid,

binding, continuing, enforceable, fully perfected security interest in and lien upon all Collateral

that is junior and subject to Prepetition Deeds of Trust; _provided that_ nothing in this subparagraph

shall limit the rights of the DIP Lender under the DIP Documents to the extent such liens are not

permitted thereunder.

(e)      _Liens Senior to Certain Other Liens._ The DIP Liens shall not be (i) subject

or subordinate to or made _pari passu_ with (A) any lien or security interest that is avoided and

preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code,

(B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or

security interests arising after the Petition Date, including, without limitation, any liens or security

interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any other intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

7.      *Protection of Rights of DIP Lender and Prepetition Secured Lenders.*

(a)      Nothing in this Interim Order shall be deemed to limit the rights of the Prepetition Secured Lenders with respect to their Motion for Relief from Stay, currently pending before this Court, and the Debtors and Prepetition Secured Lenders reserve all rights in connection therewith.   .

(b)      *Termination Date.* On the Termination Date (as defined below) (i) all DIP Obligations shall be immediately due and payable and all DIP Commitments will terminate; (ii) the DIP Lender may terminate, reduce, or restrict the ability of the Debtors to use Cash Collateral or the proceeds thereof; *provided, however,* that the Debtors may use Cash Collateral solely to fund the Carve-Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget; and (iii) the DIP Lender shall be otherwise entitled to exercise rights and remedies under the DIP Documents, in accordance with this Interim Order.

(c)      *Rights and Remedies Upon Event of Default.*

(i)      Upon an Event of Default, as set forth in the "Events of Default" section of the DIP Term Sheet, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Documents and this Interim Order: (A) the DIP Lender may

21

declare, which declaration shall be in writing and delivered by email or overnight mail to the

Debtors, any Creditors' Committee, and the U.S. Trustee (any such declaration shall be referred to

herein as a "Termination Declaration") (1) all DIP Loans (including principal of, and accrued

interest on, any outstanding DIP Loans) to be immediately due and payable, (2) the termination of

any further commitment to lend to the DIP Borrower without affecting any of the DIP Liens or the

DIP Obligations, and/or (3) that any obligations to fund the Carve-Out Reserve shall be triggered

through the delivery of the Carve-Out Trigger Notice to the DIP Borrower; and/or (B) the DIP

Lender may terminate, reduce, or restrict the ability of the Debtors to use Cash Collateral or the

proceeds thereof (the date on which a Termination Declaration is delivered, the "Termination

Date").

   (ii)  The Debtors or any other party in interest shall be entitled to seek an

emergency hearing with the Court to be held as soon as practicable after the Termination Date for

the purpose of determining whether an Event of Default has occurred or is continuing, and with

respect to such other matters determined to be relevant by the Court.

   (d)  No rights, protections or remedies of the DIP Lender or the Prepetition

Secured Lenders granted by the provisions of this Interim Order or the other DIP Documents shall

be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the

consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or

purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms

of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the

provision of adequate protection to any party, except upon further order of this Court.

   8.  *Use of Cash Collateral.* The Debtors are hereby authorized, subject to the terms

and conditions of this Interim Order, to use Cash Collateral in accordance with the DIP Documents

and the Approved Budget; *provided that* (a) the Prepetition Secured Lenders are granted the Adequate Protection as hereinafter set forth; (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using Cash Collateral absent further order of the Court.

9.      *Disposition of DIP Collateral*. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise provided for in the DIP Documents or an order of the Court.

10.      *Adequate Protection*.

(a)      *Adequate Protection of the Prepetition Secured Lenders*. The Prepetition Secured Lenders are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value of the Prepetition Secured Lenders' interests in the Prepetition Collateral from and after the Petition Date (with, as follows (the "Adequate Protection Obligations"):

(i)      *Prepetition Adequate Protection Liens*. The Prepetition Secured Lenders are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), in each case senior to all other liens.

(ii)      *Prepetition Secured Lenders' Payments*. To the extent allowed pursuant to section 506(b) of the Bankruptcy Code, interest shall continue to accrue on the Prepetition Term Loans at the applicable non-default rate of interest under the Prepetition Secured

Loans, and paid by the Debtors to the Prepetition Secured Lenders in accordance with the terms of the Consent Order entered by this Court on [_____], 2025 [ECF Docket. No. __].

        (iii)      *Maintenance of Collateral.* The Debtors shall continue to maintain and insure the Prepetition Collateral and DIP Collateral, as required under the Prepetition Deeds of Trust and the DIP Documents and/or as otherwise agreed among the Debtors, the Prepetition Secured Lenders, and the DIP Lender.

        11.      *Reservation of Rights of Prepetition Secured Lenders.* Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Lenders and any other parties' holding interests that are otherwise affected by the Debtors' authorized use of the Prepetition Collateral (including Cash Collateral).

        12.      *Perfection of DIP Liens and Adequate Protection Liens.*

        (a)      Without in any way limiting the automatic validity and effective perfection of the DIP Liens granted pursuant to paragraph 6 hereof and the Adequate Protection Liens granted pursuant to paragraph 10 hereof, the DIP Lender is hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Lender, or take possession of or control over cash or securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, and any other similar action or action in connection therewith or take any other action in order to document, validate and perfect the liens

24

and security interests granted to them hereunder the ("Perfection Actions"). Whether or not the

DIP Lender shall take such Perfection Actions, the liens and security interests shall be deemed

valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or

subordination, at the time and on the date of entry of this Interim Order.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP

Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as

applicable. The Automatic Stay shall be modified to the extent necessary to permit the DIP Lender

to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding

subparagraph (a).

13.     *Interim Order Governs.* In the event of any inconsistency between the provisions

of this Interim Order and the DIP Documents (including, but not limited to, with respect to the

Adequate Protection Obligations and any provisions of the DIP Term Sheet) or any other order

previously entered by this Court, the provisions of this Interim Order shall govern.

Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions

by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim

Order, including compliance with the Approved Budget (subject to permitted variances) and all

other terms and conditions hereof, and (b) to the extent there is any inconsistency between the

terms of such other order and this Interim Order, this Interim Order shall control, in each case,

except to the extent expressly provided otherwise in such other order.

14.     *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of

this Interim Order, including all findings herein, shall be binding upon all parties in interest in the

Chapter 11 Cases, including, without limitation, the DIP Lender, the Prepetition Secured Lenders, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Lender, the Prepetition Secured Lenders, and the Debtors and their respective successors and assigns; _provided_ that the DIP Lender and the Prepetition Secured Lenders shall have no obligation to permit the use of the DIP Collateral or the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

15.     _Limitation on Liability_. Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Lenders any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The DIP Lender and Prepetition Secured Lenders shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral or Prepetition Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors. By virtue of making any loan or other extension of credit under the DIP Documents, to permit the use of the

26

DIP Collateral or the Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lender shall not (x) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (y) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (z) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.,* as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Lender or the Prepetition Secured Lenders of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

16.    *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

17.    *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

18.    *Payments Held in Trust.* Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the Debtors, in the event that any person or entity

receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and shall immediately turn over the proceeds to the DIP Lender, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

19.     *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

20.     *No Third-Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

21.     *Necessary Action*. The Debtors, the DIP Lender and the Prepetition Secured Lenders are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

22.     *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

23.     *Final Hearing*. A final hearing to consider the relief requested in the DIP Motion shall be held on **November [•], 2025 at [          ] (prevailing Eastern Time)** by remote video conference.  All parties wishing to attend must reference the Court's website for access instructions. Any objections or responses to the DIP Motion shall be filed on or prior to **November**

**[•], 2025 at [          ] (prevailing Eastern Time)** and served on the following parties at their

respective addresses for notices on the record in these bankruptcy cases: (a) the U.S. Trustee; (b)

counsel to the Debtors; (c) the DIP Lender; (d) counsel to the Prepetition Secured Lender.


* * * END OF ORDER * * *

## **Exhibit 1**

**DIP Term Sheet**

[to be attached]

## **Exhibit 2**

**Initial DIP Budget**

To be filed

# <u>EXHIBIT B</u>

## DIP Term Sheet

**FOR DISCUSSION PURPOSES ONLY AND
NOT A COMMITMENT UNLESS AUTHORIZED BY ORDER OF THE COURT**

**1524 CC Rd LLC and 1528 CC Rd LLC**

**Junior Secured Super Priority Debtor in Possession Credit Facility
Summary of Principal Terms and Conditions**

This Term Sheet (including all exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "<u>DIP Term Sheet</u>"), describes the terms and conditions of the junior secured superpriority debtor in possession term loan facility defined below, to be provided by **AQUARRYUM LLC** (the "<u>DIP Lender</u>"), to **1524 CC Rd LLC**, a Virginia limited liability company ("**1524**") and **1528 CC Rd LLC**, a Virginia limited liability company ("**1528**", together with 1524, the "<u>DIP Borrower</u>"), in connection with cases (collectively, the "<u>Bankruptcy Cases</u>") filed by the DIP Borrower (individually, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), in the United States Bankruptcy Court for the Western District of Virginia (the "<u>Bankruptcy Court</u>"), pursuant to chapter 11 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>"). Capitalized terms used but not defined herein have the meanings assigned to them in the Interim DIP Order (as defined below).

| | |
|---|---|
| **Petition Date:** | July 14, 2025, being the date upon which the DIP Borrower filed its petition for relief under the Bankruptcy Code |
| **DIP Borrower:** | 1524 CC Rd LLC and 1528 CC Rd LLC |
| **DIP Lender:** | Aquarryum, LLC |
| **DIP Credit Facility:** | A junior secured debtor in possession term loan facility (the "**DIP Credit Facility**") consisting of (i) a $200,000 new money term loan (the "**DIP Loan Commitment**" in the form of a delayed draw term loan facility, $10,000 of which will be available after the entry the order (the "**Interim DIP Order**") approving the DIP Credit Facility on an interim basis and the establishment of a DIP Loan Account and $190,000 will be available to draw after the entry of the order approving the DIP Credit Facility on a final basis (the "**Final DIP Order,**" and together with the Interim DIP Order, the "**DIP Orders**"). The obligations under the DIP Credit Facility are referred to as the "**DIP Obligations**". The DIP Credit Facility's liens on the Collateral (as defined below) to secure the DIP Obligations will be junior and subordinate to any liens and replacement liens (the "**Existing Liens**") granted under or in connection with the following secured loans: <br><br> (1) *Balloon Promissory Note* in the original principal amount of $230,000, dated July 13, 2023, 1524 as borrower and Exchangers, LTD ("**Exchangers**") as lender (the "**1524 Purchase Money Facility**"), which was subsequently assigned to Roosevelt Road Holdings, LLC, which is secured by the real estate located at 1524 Country Club Road in Harrisonburg, Virginia (the "**1524 Real Estate**"); |

|  | (2) *Promissory Note* in the original principal amount of $500,000, dated July 13, 2023, 1524 as borrower and Roosevelt Road Holdings, LLC (the "**Roosevelt Road Note**") as lender, for the purpose of purchasing the 1524 Real Estate and the real estate located at 1528 Country Club Road in Harrisonburg, Virginia (the "**1528 Real Estate**"). The Roosevelt Road Note is secured by the 1524 Real Estate and the 1528 Real Estate;

(3) *Balloon Promissory Note* in the original principal amount of $970,000, dated July 13, 2023, 1528 as borrower and Exchangers as lender (the "**1528 Purchase Money Facility**"), which was subsequently assigned to Roosevelt Road Holdings, LLC, which is secured by the 1528 Real Estate;

(4) 1528 granted Roosevelt Road Holdings, LLC a second-priority lien in the 1528 Real Estate as security for $400,000 of the Roosevelt Road Note.

The foregoing loans are referred to herein as the "**Prepetition Secured Loans**", the secured obligations are referred to as the "**Prepetition Liens**", and Roosevelt Road is referred to herein as "**Roosevelt Road**" or the "**Prepetition Secured Lenders**". |
|---|---|
| **Purpose:** | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (as defined below), (a) to pay transaction costs, fees, and expenses which are incurred in connection with the DIP Facility, including all fees and costs incurred by professionals employed by the Proposed DIP Lender; and (b) for providing for adequate protection payments to Roosevelt Road and working capital and other general corporate purposes of the Debtors, all subject to the Approved Budget and certain restrictions to be set forth in the Interim DIP Order and/or Final DIP Order, as applicable, and the documents governing the DIP Facility. Neither proceeds of the DIP Facility nor Cash Collateral shall be used to pay administrative expense claims under section 503(b)(9) of the Bankruptcy Code. |
| **Interest:** | 12% per annum on the DIP Loans, payable in kind, which shall be paid in cash on the date on which any DIP Loans are repaid or prepaid, at the DIP Loan Maturity Date as defined herein and/or upon the acceleration of the DIP Facility.

All interest shall be calculated as simple interest on the basis of a 360-day year for the actual number of days elapsed. |
| **Maturity Date:** | The DIP Loan shall be due and payable upon the earliest of (i) the date that is Nine months after the Petition Date, (ii) the closing date of a sale of substantially all of the Debtors' assets, (iii) the Chapter 11 Plan (as defined below) effective date, (iv) the date of dismissal of the chapter 11 cases or conversion to chapter 7, (v) the acceleration of the DIP Facility following |

| | |
|---|---|
| | an Event of Default, and (vi) at the Proposed DIP Lender's option, the failure of Debtors timely to satisfy any Milestone (as defined below). |
| **Approved Budget** | Attached hereto as Exhibit 1 is a thirteen-week operating budget for the Debtors outlining actual and anticipated expenses for which the Proposed DIP Lender has agreed to provide funding, subject to the terms of the DIP Term Sheet and the DIP Orders (the "**Approved Budget**"). Upon entry of the Interim DIP Order, the Proposed DIP Lender will advance the sum of $ 10,000 to the Debtors solely for payment of those expenses described in the Approved Budget. Thereafter, the Proposed DIP Lender shall make additional DIP Loans available from time to time, but not more frequently than once during any calendar week, upon the Debtor's written request, which shall be accompanied by (i) an itemization of all expenses set forth in the Approved Budget for which funding is then sought, and (ii) a reconciliation of the Approved Budget showing the application of all amounts previously disbursed and any actual or anticipated changes in budgeted expenses (collectively, a "**Draw Request**"). The Approved Budget may be revised from time to time in the sole discretion of the Proposed DIP Lender, provided that the Proposed DIP Lender shall at no time be obligated to consent to any change in the Approved Budget requested by the Debtors. Proceeds of the DIP Loans shall be maintained in a segregated bank account over which the Proposed DIP Lender shall retain control, and which shall be subject to the DIP Liens (as defined in the DIP Term Sheet) in favor of the Proposed DIP Lender (the "**DIP Loan Account**"). Funds on deposit in the DIP Loan Account shall be available to the Debtors from time to time to be applied directly to the payment of amounts permitted to be paid under the Approved Budget as and when the same shall become due and payable, subject to the terms and conditions of this DIP Term Sheet and the DIP Orders. |
| **Milestones:** | The Debtors shall be required to achieve the following milestones (collectively, the "**Milestones**") which may be extended or waived in writing by the Proposed DIP Lender, in its sole discretion:<br><br>• No later than October 22, 2025, the Debtors shall have filed the DIP Financing Motion and set for hearing on interim basis;<br>• No later than October 29, 2025, the hearing on the approval of the Interim DIP Order approving the DIP Facility on an interim basis, in form and substance acceptable to the Proposed DIP Lender, shall go forward, unless otherwise directed by the Court;<br>• No later than November 19, 2025, the hearing on approval and entry of a Final DIP Order approving the DIP Facility on a final basis, in form and substance acceptable to the Proposed DIP Lender shall go forward, unless otherwise directed by the Court;<br>• No later than 90 days after the entry of the Final DIP Order Date, unless the Proposed DIP Lender and the Prepetition Secured Lenders otherwise agree, the Debtors shall have filed a chapter 11 plan (the "**Chapter 11 Plan**") and disclosure statement, which shall be acceptable in form and substance to the Proposed DIP Lender; and |

3

| | |
|---|---|
| | • No later than 120 days after the entry of the Final DIP Order, unless the Proposed DIP Lender and the Prepetition Secured Lenders otherwise agree, the Bankruptcy Court shall have entered an order (the "**Confirmation Order**") confirming the Chapter 11 Plan, which Confirmation Order shall be in form and substance acceptable to the Proposed DIP Lender. |
| **Events of Default:** | The occurrence of any of the following shall constitute an "Event of Default": |
| | (a) the entry of an Interim DIP Order in form or substance that is not reasonably acceptable to the Proposed DIP Lender in its sole discretion; or entry of a Final DIP Order that is not reasonably acceptable to the Proposed DIP Lender in its sole discretion; |
| | (b) failure to pay principal DIP Obligations in full when due, including without limitation, on the Maturity Date (as defined in the DIP Term Sheet); |
| | (c) failure to pay interest, fees or other amounts in full within three (3) business days after the date due following written notice, including without limitation, on the Maturity Date; |
| | (d) failure of any representation, warranty or certification to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (e) failure by any Debtor to be in compliance in all material respects with the provisions of the DIP Term Sheet, any DIP Order or any other order of the Bankruptcy Court following five (5) business days' written notice and an opportunity to cure; |
| | (f) dismissal of any of the Debtors' Bankruptcy Cases; |
| | (g) the appointment in any of the Bankruptcy Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor, without the prior written consent of the Proposed DIP Lender; |
| | (h) failure of any Milestones to be satisfied by the specified deadline therefor; |
| | (i) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Bankruptcy Cases with respect to any portion of the DIP Collateral with an aggregate value exceeding $25,000 without the prior written consent of the Proposed DIP Lender; or |

| | |
|---|---|
| | (k) any creditor or party in interest commences (or supports) any action against the Proposed DIP Lender to subordinate or avoid any liens granted hereunder or under any DIP Order in favor of the Proposed DIP Lender. |
| **Collateral** | "**Collateral**" means, collectively, all assets of the DIP Borrower and their bankruptcy estates of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property interests (whether fee, leasehold, easement or mixed), books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.<br><br>For the avoidance of doubt, upon entry of the Interim DIP Order the DIP Collateral shall include an automatically perfected and unavoidable first-priority security interest in, and liens on all claims and causes of action and the proceeds of thereof.<br><br>The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**") or their proceeds.<br><br>All of the DIP Liens (as defined below) with respect to the Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the Proposed DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the DIP Liens, or to enable the DIP Lenders to protect, exercise or enforce its rights hereunder and under the Interim DIP Order and the Final DIP Order. |
| **Security and Priority Status** | The DIP Orders shall grant and approve, among other things, the liens, claims and security interests of DIP Lenders (the "**DIP Liens**"), in the order of priority described below:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim in the Bankruptcy Cases in respect of all DIP Obligations (the "**DIP Superpriority Claim**") with priority over all other |

| | |
|---|---|
| | administrative expenses and claims; provided, however, that the DIP Superpriority Claims shall be junior to a customary "Carve Out" (to the extent agreed upon by the DIP Lenders and set forth in the DIP Orders);<br><br>(b) pursuant to section 364(c)(2) of the Bankruptcy Code, but subject and junior to the Carve Out, all DIP Obligations shall be secured by automatically perfected and unavoidable first priority security interests in, and liens on, (i) all cash borrowed under the DIP Credit Facility (which shall constitute cash collateral of the DIP Lender), which cash shall be held in the segregated DIP Loan Account and not otherwise co-mingled with any other cash of the Debtors, and (ii) all unencumbered Collateral of the Debtors, whether now existing or hereafter arising and wherever located, tangible and intangible, including without limitation the claims and causes of action; and<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, but subject and junior to the Carve Out, all DIP Obligations shall be secured by automatically perfected and unavoidable junior security interests in and liens on, all Collateral of the Debtors, whether now existing or hereafter arising and wherever located, tangible and intangible (clauses (b) and (c), collectively, the "**DIP Collateral**").<br><br>The DIP Liens shall be subject only to any validly perfected and non-avoidable liens, which as of the Petition Date were senior to liens securing obligations under the Prepetition Loans. |
| **Conditions Precedent** | The obligation of the Proposed DIP Lender to advance DIP Loans hereunder will be subject to satisfaction, or written waiver by the Proposed DIP Lender, of each of the following conditions precedent as of the date of each such advance (each a "<u>Funding Date</u>"):<br><br>(a) the Interim DIP Order and the Final DIP Order, as applicable, shall have been entered by the Bankruptcy Court and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief therein provided;<br><br>(b) the Bankruptcy Court shall have entered orders, interim and final, authorizing the Debtors to use the Prepetition Secured Lenders' cash collateral and such orders shall be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or to challenge the relief therein provided;<br><br>(c) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on and as of the applicable Funding Date, and the Debtors shall have established the DIP Loan Account; |

| | |
|---|---|
| | (d) no Event of Default (as defined below) under the DIP Facility or under any DIP Order shall have occurred and be continuing as of the applicable Funding Date, or shall exist after giving effect to the requested disbursement;<br><br>(e) the Proposed DIP Lender shall be satisfied that the liens and security interests of the Proposed DIP Lender in the DIP Collateral (as defined in the Interim DIP Order) have been perfected by the DIP Orders and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in the DIP Term Sheet;<br><br>(f) the Bankruptcy Court shall have ruled upon all such motions (whether made by the Proposed DIP Lenders or others), and issued all such orders in the Bankruptcy Cases as the Proposed DIP Lender may deem necessary or appropriate as a condition to funding of any DIP Loans;<br><br>(g) no condition, event or circumstance arising subsequent to the Petition Date shall then exist which would be expected to have a material adverse effect on (i) the DIP Collateral or the Proposed DIP Lender's liens on the DIP Collateral or the priority of such liens, or (ii) the Proposed DIP Lender's rights and remedies under the DIP Term Sheet or any DIP Order; and<br><br>(h) Proposed DIP Lender shall then be satisfied, in its sole discretion, that the continued funding of DIP Loans is reasonably likely to preserve and enhance the value of all Collateral for the purpose of facilitating an orderly disposition thereof. |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the laws of the Commonwealth of Virginia shall govern this DIP Term Sheet. The Debtors will submit to the exclusive jurisdiction and venue of the Bankruptcy Court. |
| **Execution:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Term Sheet shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. As used herein, "**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record. |

| Notices: | Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by email, as follows: |
|---|---|
| | To DIP Lender: |
| | Aquarryum LLC<br>c/o Dominique Kostelac<br>1785 Frays Mill Road<br>Ruckersville, Virginia  22968-1620 |
| | To Debtors: |
| | 1524 CC Rd LLC and 1528 CC Rd LLC<br>c/o Dominique Kostelac<br>1785 Frays Mill Road<br>Ruckersville, Virginia  22968-1620 |
| | with a copy to: |
| | Michael E. Hastings<br>Woods Rogers Vandeventer Black PLC<br>10 S. Jefferson Street, Suite 1800<br>Roanoke, VA  24011<br>Email: michael.hastings@woodsrogers.com |
| | Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by email shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). |
| **Carve-Out:** | The term "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice (as defined below)) in an aggregate amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any official Creditors' Committee (the "Estate Professionals") at any time on or before the first business day following delivery by the Proposed DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a |

Carve-Out Trigger Notice up to but not in excess of the amount approved in the Approved Budget for each such Estate Professional (whether to be actually paid or to be accrued) through the date of the Carve-Out Trigger Notice (the amounts set forth in the foregoing clauses (i), (ii) and (iii), the "Pre-Carve-Out Trigger Notice Amount"); and (iv) Allowed Professional Fees of the Estate Professionals incurred after the date of delivery by the Proposed DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order or other court order, in an aggregate amount not to exceed $75,000 for the Debtors' professionals and $25,000 for professionals of any official Creditors' Committee (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). Nothing herein shall limit the ability of any Estate Professional to seek payment of any allowed fees and expenses as an administrative expense in these Bankruptcy Cases.  For purposes of this Interim Order, the "Carve-Out Trigger Notice" shall mean a written notice (which may be made via electronic mail or other electronic means) delivered by the Proposed DIP Lender) to the Debtors and their counsel, Woods Rogers Vandeventer Black PLC, stating that the Trigger Notice Cap has been invoked. The Carve-Out Trigger Notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.

**Priority of Carve-Out:** Each of the DIP Liens and the DIP Superpriority Claims (as defined below) shall be subject and subordinate to payment of the Carve-Out.

"**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to Debtors' counsel, the U.S. Trustee, and counsel to the UCC, which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Credit Facility and acceleration of the DIP Loans stating that the cap on professionals' fees described above has been invoked.

**[Signatures to appear on following page]**

**IN WITNESS WHEREOF**, each of the undersigned has caused this DIP Term Sheet to be duly executed and delivered by its authorized officer as of the day and year first above written.

**DIP LENDER:**                    **AQUARRYUM LLC**

By: _____

Print Name: _____

Title: _____

**DIP BORROWERS:**                 **1524 CC Rd LLC**

By: _____

Print Name:_____

Title: _____

**1528 CC Rd LLC**

By: _____

Print Name:_____

Title: _____

## **Exhibit 1**

**Budget**

JOINT PROPOSED BUDGET FOR
BOTH DEBTORS

| WEEK: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ending 11/1/25 | Ending 11/8/25 | Ending 11/15/25 | Ending 11/22/25 | Ending 11/29/25 | Ending 12/6/25 | Ending 12/13/25 | Ending 12/20/25 | Ending 12/27/25 | Ending 1/3/26 | Ending 1/10/26 | Ending 1/17/26 | Ending 1/24/26 |
| **Projected Income** | | | | | | | | | | | | | |
| Rents | 1500 | 600 | | 250 | | 1500 | 600 | 250 | | 1500 | 600 | | 250 |
| Other | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Projected Expenses** | | | | | | | | | | | | | |
| Utilities | | 450 | | | | 450 | | | | | 450 | | |
| Insurance | | | 1000 | | | | 1000 | | | | | 1000 | |
| Taxes | | | | | | | | 445.92 | 4979.52 | | | | |
| Adequate Protection Payments | 7000 | | | | | 9000 | | | | 11000 | | | |
| UST Quarterly Fees | 250 | | | | | | | | | | | 250 | |
| | | | | | | | | | | | | | |
| Property Marketing, Maintenance, and Development | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Legal Fees | (Subject to Court Approval) | | | | | | | | | | | | |
| Other | 25 | | | | 25 | | | | | 25 | | | |